IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

O'SHAY JOHNSON,

          Petitioner,               No. CIV S-08-496 MCE KJM P

      vs.

D.K. SISTO,                        <u>ORDER AND</u>

          Respondent.         <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

          Petitioner is a state prison inmate proceeding pro se with a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging his 1993 Sacramento County conviction for attempted murder and other offenses.  Respondent has filed a motion to dismiss, alleging that the action was filed beyond the statute of limitations.  Petitioner has opposed the motion, and respondent has filed a reply.

          On September 10, 2009, the court recommended that the motion to dismiss be granted.  On November 20, 2009, petitioner filed objections, arguing, among other things, that the findings and recommendations do not properly take account of the Supreme Court's decision in <u>Burton v. Stewart</u>, 549 U.S. 147 (2007).  <u>See</u> Objections at 3, 15.  Respondent has filed a response and petitioner has replied.  On the basis of these objections, the court vacates the

/////

findings of September 10, 2009, and addresses here the questions raised in the motion to dismiss and the objections.

I. Factual Background

As a backdrop to the issues raised by the instant motion, this court relies on the summary of the facts presented by the state Court of Appeal:

> There are two large African American gangs, Crips and Bloods. Both are involved in the trafficking of narcotics and violent crimes such as robbery, drive-by shooting, and assault with deadly weapons. In Sacramento, Bloods predominate and mostly traffic in rock cocaine, which funds gang activities. A "set" is a segment of Bloods or Crips, usually organized by neighborhood or street of reidence. One set of Bloods in the Del Paso Heights area is the Militant Organized Brothers (MOB). . . . MOB adopted a policy to control narcotics trafficking in its neighborhood, suppressing competition of outsiders through robbery and other acts of violence. . . . In October 1992, Arnold Butler, a MOB member, was convicted of possession of rock cocaine for sale.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . . Both defendants [petitioner and co-defendant Wayne Lewis] were identified by the police as members of MOB . . . before the shooting of Stanley Weaver.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> In late May and June 1992, there was a lot of violence occurring on the streets of Del Paso Heights between different gang sets. The MOB had not been "getting along with" other sets of the Del Paso Heights Bloods. A dispute arose between Anthony Weaver, a member of the Elm Street Posse, a set of the Del Paso Heights Bloods, and defendant Johnson. At the time Weaver made his living by selling rock cocaine. Weaver testified that Johnson was an ordinary gang member while Lewis was an "original gangster," a more senior member.
>
> On the evening of June 21, 1992, Johnson hailed Weaver when Weaver was riding home from the store on his bicycle. Weaver did not reply, rather he sped away. Johnson chased him, firing two shots. During the chase Johnson pulled a ski mask down over his face. Weaver was armed with a pistol and fired it into the air. Sometime that night afer Weaver returned home, at 4004 Fell

Street, someone drove by and fired bullets into the house. A police officer called to the scene soon after the shooting found a 9 millimeter bullet and shell casings in the street and 9 millimeter slugs inside the house.

Shortly before 11 p.m. on the night of June 22, 1992, someone fired gunshots from the street into the home of defendant Johnson's mother at 154 Estes Way. Defendant Johnson was not home; however, his mother spoke with him that night after the shooting.

Shortly before midnight on June 22, 1992, someone fired more shots into the home of Weaver.

Also on the evening of June 22, 1992, sometime after 10 p.m. someone took Raymond Chess's brown Chevy station wagon . . . . It was abandoned later that night in front of the home of Vincent Bolton . . . a block from the home of Johnson's mother. Bolton saw the people who abandoned it leave in a gray or blue four door car. Defendant Johnson's latent fingerprint impressions were found on the abandoned vehicle.

On the morning of June 23, 1992, shortly before 9:30 a.m. Stanley Weaver, Anthony Weaver's father, was standing outside the Weaver house chatting with a neighbor. A gray car pulled up, coming north from the direction of North Avenue. In the car were three African American men with ski masks on. The driver fired a shot at Stanley Weaver; he turned to run and another shot hit him in the hip and he fell down. The car then drove up on the Weavers' lawn. The men continued to shoot at Stanley Weaver who, after being hit six times, crawled under his neighbor's car. The driver pursued him while his passengers shot at the Weaver house. The driver stuck his gun underneath the car and shot Stanley Weaver repeatedly.

Lewis is similar in physique to the driver. Johnson is similar in physique to the two smaller passengers.

Anthony Weaver came to the doorway of the Weaver home and fired one shot; his gun jammed. The three men in ski masks ran south on Fell Street and east on North Avenue. The abandoned gray car had been stolen sometime after 6 p.m. the night before.

The first 911 call reporting the Weaver shooting incident was received at 9:26 a.m. . . . At 9:34 a.m. another 911 call was received from Gregory Augustus . . . . In the 911 call Augustus reported that three African American males armed with guns were in the backyard, one had no shirt on, and that they were the "suspects" in the shooting on Fell Street. The men went through the yard, around the side of the house.

/////

3

Augustus was watering the grass when the men went by. At trial he equivocally identified defendant Lewis as one of the three men; before trial he had identified both defendants in a photographic lineup.

LaShawn Williams was a passenger in a car being driven down North Avenue toward Fell Street on the morning Stanley Weaver was shot. She saw the defendants and another man hurry out of the alley behind Huron Street and get into a brown car parked in front of the alley. Defendant Johnson had no shirt on, he appeared to be carrying an object wrapped up in a shirt or something.

Jae Oney lives on North Avenue across from the Huron Street alley. The evening before Stanley Weaver was shot Oney saw a brown car parked blocking the alley. The morning of the Weaver shooting the car was still there and Oney, concerned about fire truck access, called the police department to complain. Officer Marlin Peterson arrived at 8:50 a.m. that morning and found a brown Oldsmobile partially blocking the Huron Street alley. The registered owner of the car is defendant Johnson. Peterson left the scene at 9:08 a.m. and returned at 10:08 a.m.; the car was no longer there.

Stanley Weaver suffered 11 gunshot wounds. He was shot through the penis and lost a testicle; he received two shots to the foot requiring repeated surgeries and has difficulty walking as a result. A comparison of shell casings recovered on June 21st and on June 23d at the Weaver residence showed that two of the same guns were used on each occasion.

After his arrest on June 23, 1992, defendant Johnson told a police investigator he had spent the night before with a woman named Talisha at her house and had not left her house until he drove to his grandparent's [sic] house at noon.[1]

Lodged Document (Lodg. Doc.) 2 at 3-7.

Among the issues in petitioner's federal habeas petition is a claim that he was denied the effective assistance of counsel at trial in part because of multiple failures: a failure to investigate and substantiate petitioner's alibi; a failure to impeach LaShawn Williams, the only prosecution witness positively to identify petitioner; and a failure to investigate third party

---

[1] Petitioner alleges that Vincent Belton testified that petitioner was not one of the men getting into the stolen car, though Joe Marshall was; that Gregory Augustus signed the back of petitioner's picture only because the police asked him to do so; and that LaShawn Williams never testified that petitioner was not wearing a shirt. Objections ¶ 52. The court notes these differences, but ultimately determines they do not change the analysis of petitioner's claims.

culpability. Petition (Pet.) (Docket No. 1) at 32-37.[2] Petitioner supports this claim with three declarations. The first is from petitioner's cousin, Joseph Marshall, who avers he told police he did not steal a car and was not in a stolen car with petitioner, yet trial counsel never interviewed him. Pet., Attach. C at 104. The second is from Joe Williams, who avers he was not with LaShawn Williams on June 23, 1992, and did not see petitioner in Del Paso Heights that day.[3] Joe Williams further avers he was not interviewed by law enforcement or by petitioner's counsel. Id., Attach. C at 105. The third is from Freddie Marshall, who was present when his grandfather Elisha Marshall told a defense investigator that petitioner had called Elisha Marshall's house the morning of the day he was arrested. Id., Attach. C at 107. All of these declarations are dated January 2008.

Petitioner has attached additional declarations to his opposition to the motion to dismiss. It is not clear whether he is offering these other declarations as part of his underlying habeas petition, or as information suggesting that he is actually innocent of the charges. One, dated March 2005, is from Arnold Butler who avers he was not a member of the MOB, had no knowledge of petitioner's membership in MOB, did not participate in any gang activities with Johnson, and was not approached by petitioner's trial lawyer about this information. See Opp'n (Docket No. 16) at 24. The second, dated February 2008, is from co-defendant Wayne Lewis, who declares he and petitioner were not together on June 22 and 23, 1992, he was not aware of petitioner's membership in the MOB, and he had been willing to testify about these subjects at trial had petitioner's counsel asked him to do so. Id. at 25.

II. Procedural History

On May 7, 1993, petitioner was sentenced to a term of fifteen years, eight months in prison followed by a term of fifteen years to life with the possibility of parole. The original

---

[2] The court relies on the page numbers assigned by the court's ECF system.

[3] Although not mentioned in the Court of Appeal's factual recitation, petitioner asserts that Joe Williams was driving the car in which LaShawn Williams was riding. Pet. ¶ 34.

abstract of judgment provided that the indeterminate term was to be served consecutively to the determinate term. Lodg. Doc. 1.

Petitioner appealed his conviction to the Court of Appeal for the Third Appellate District, which affirmed his conviction on October 24, 1994. Lodg. Doc. 2. He sought review of this determination in the California Supreme Court, which denied review on February 15, 1995. Lodg. Docs. 3 & 4.

Petitioner embarked on a series of collateral attacks on his conviction, beginning in 1999, with a habeas petition filed in Sacramento County Superior Court on May 27, 1999. Lodg. Doc. 5. This petition was denied on June 16, 1999. Lodg. Doc. 6. Petitioner filed a motion for reconsideration on July 2, 1999; this motion was denied on July 28, 1999. Lodg. Docs. 7 & 8.

On September 3, 1999, petitioner sought habeas relief in the Court of Appeal, which rejected his petition on September 30, 1999. Lodg. Docs. 9 & 10.

Petitioner returned to Sacramento County Superior Court when he filed a second petition for a writ of habeas corpus on April 20, 2006. Lodg. Doc. 11 (Superior Court Case No. 06F03701). This was denied on July 19, 2006. Lodg. Doc. 12. On November 7, 2006, petitioner sought a writ of mandate from the Court of Appeal, asking it to order the Superior Court to issue an order to show cause; this was construed as a petition for a writ of habeas corpus and denied on November 30, 2006. Lodg. Docs. 18 & 19.

Petitioner filed a motion for reconsideration sometime in 2008, but respondent has not provided a copy of this document. The order denying it, however, is dated April 18, 2008; it refers to the fact that the motion was supported by the declarations of Joe Williams, Joseph Marshall and Arnold Butler. Lodg. Doc. 13.

While the second petition, Case No. 06F03701, was pending, petitioner filed yet another habeas petition in Sacramento County Superior Court, raising only sentencing issues; it was filed as Case No. 06F05060. Lodg. Doc. 14. The Superior Court denied this petition on September 8, 2006, explaining that the sentence it imposed was proper and that the petition was

not timely. Lodg. Doc. 15. Petitioner pursued these sentencing issues in the Court of Appeal by filing a new petition in that court on October 2, 2006. Lodg. Doc. 16. This petition was denied on October 5, 2006. Lodg. Doc. 17. Thereafter, petitioner sought substantive review of his habeas claims attacking his conviction by filing a petition for a writ of habeas corpus in the Court of Appeal on December 22, 2006. Lodg. Doc. 20. This petition was denied on February 8, 2007. Lodg. Doc. 21. He pursued these claims in the California Supreme Court, in a habeas petition filed March 2, 2007. Lodg. Doc. 27. This petition was denied on May 9, 2007. Lodg. Doc. 28.

On January 14, 2007, petitioner filed a habeas petition in the California Supreme Court, raising the sentencing issues presented in Superior Court Case No. 06F05060. Lodg. Doc. 22. Petitioner alleged that his sentence was illegal on numerous grounds. Lodg. Doc. 22 (Argument III). The Supreme Court asked the Attorney General to file an informal reply, addressing the conflict between the superior court's oral pronouncement of judgment and the abstract of judgment. Lodg. Doc. 23; see also Objections (Docket No. 33) at 23. On August 8, 2007, respondent notified the court that CDCR's Legal Processing Unit sent a letter to the Superior Court, asking whether the determinate portion of petitioner's sentence was to be served consecutively or concurrently to the indeterminate portion, a decision which could have an impact on petitioner's minimum eligible parole date (MEPD). Lodg. Doc. 23; Objections at 24-26. The Supreme Court denied this petition on October 10, 2007. Lodg. Doc. 23.

On August 16, 2007, the Superior Court issued an amended abstract of judgment showing a total determinate term of fifteen years, eight months and an indeterminate term of fifteen years to life concurrent to the determinate sentence. Lodg. Doc. 24. The amended abstract for the determinate term is signed on "8/15/07 nunc pro tunc to 5/27/93"; the amended abstract for the indeterminate term is signed on "8/14/07 nunc pro tunc to 7/29/93." The document is identified as an "amended abstract of judgment" and lists the date the judgment was imposed as May 7, 1993. Id.

/////

Petitioner did pursue additional habeas relief, but these additional attacks flowed from his attempts to correct information in his central file or his challenges to a denial of parole. Lodg. Docs. 25, 26, 29-35.

III.  <u>Analysis</u>

One of the changes the Antiterrorism and Effective Death Penalty Act (AEDPA) made to the habeas statutes was to add a statute of limitations for filing a habeas petition:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post- conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244.

A.  <u>Limitations Period Triggering Date</u>

For those whose convictions were final before the effective date of the AEDPA, the statute of limitations began to run the day after AEDPA's effective date and expired on April 24, 1997.  <u>Bryant v. Arizona Attorney General</u>, 499 F.3d 1056, 1058 (9th Cir. 2007).

/////

Petitioner argues, however, that in his case the limitations period did not begin to run until after the issuance of the amended abstract of judgment on August 16, 2007, and that the federal petition, filed March 5, 2008, thus is timely.  He relies on <u>Burton v. Stewart</u>, 549 U.S. 147 (2007) and <u>Ferreira v. Secretary, Department of Corrections</u>, 494 F.3d 1286 (11th Cir. 2007).  Neither case supports his position.

In <u>Burton</u>, the petitioner was sentenced in 1994 to a total term of 562 months; the trial court imposed the sentence by running three terms consecutively and, in the alternative, by running the terms concurrently but finding the sentence for Burton's rape conviction to be otherwise too lenient under Washington law.  After an unrelated prior conviction was reversed, Burton sought resentencing.  In 1996, the trial court recalculated Burton's offender scores and again sentenced him to 562 months for the rape conviction, finding it exceptional.  Burton sought direct review of his conviction and this sentence; the Court of Appeal affirmed the conviction, but remanded the case for resentencing.  Accordingly, in March 1998, the trial court entered a second amended judgment and sentence and imposed a 562 month sentence by running Burton's three sentences consecutively.  <u>Burton</u>, 549 U.S. at 150-51.

While his direct review of this sentence was pending, Burton filed a federal habeas petition.  He noted that he was challenging his 1994 conviction and acknowledged that the sentence he had received on resentencing was then on appeal.  Both the district court and the Ninth Circuit rejected his petition.  <u>Id</u>. at 151.  In 2002, Burton filed another federal habeas petition attacking his sentence only.  Both the district court and the Ninth Circuit rejected the state's claim that the petition was successive, but denied it on the merits.  <u>Id</u>. at 152.

The Supreme Court ultimately found that the lower courts lacked jurisdiction over the petition because it was indeed successive, and Burton had never received authorization to pursue it.  It reasoned that Burton was in custody under the 1998 judgment when he filed the 1998 petition and the 2002 petition and so he "twice brought claims contesting the same custody imposed by the same judgment of a state court."  <u>Id</u>. at 153.

1    Burton argued that had he waited for the conclusion of direct review of the 1998

2    resentencing, his federal petition raising claims related to his underlying conviction would be

3    time-barred.  The Supreme Court said:

4           [T]he limitations period applicable to a person in custody pursuant
             to the judgment of a State court shall run from . . . the date on which
5           the judgment became final by the conclusion of direct review or the
             expiration of the time for seeking such review.  Final judgment in a
6           criminal case means sentence.  The sentence is the judgment.
             Accordingly, Burton's limitations period did not begin until both his
7           conviction *and* sentence became final by the conclusion of direct
             review or the expiration of the time for seeking such review–which
8           occurred well *after* Burton filed his 1998 petition.

9    Id. at 156-57 (emphases in original; internal quotations, citations omitted).

10          The Eleventh Circuit followed Burton in Ferreira v. Secretary, Dept. of

11   Corrections, 494 F.3d 1286 (11th Cir. 2007).  In that case, the AEDPA statute of limitations

12   expired before the petitioner filed a second post-conviction motion to correct his sentence, which

13   was granted.  The petitioner was resentenced and filed his federal habeas petition fifty-seven days

14   after that judgment was final; he challenged only his underlying conviction, not the resentencing

15   itself.  Id. at 1288.  The district court found the petition untimely because it challenged only the

16   conviction, not the resentencing.  Id.

17          Relying on Burton, the Eleventh Circuit reversed.  It recognized that "the judgment

18   to which AEDPA refers is the underlying conviction and most recent sentence that authorizes the

19   petitioner's current detention," and "the judgment that forms the basis of the habeas petition is the

20   one that places the petitioner in custody."  Id. at 1292.

21          In this case, the judgment that "place[d] the petitioner in custody" is the judgment

22   entered in 1993.  At the original sentencing proceeding, the court sentenced petitioner to two life

23   terms for attempted murder and mayhem, but stayed the term for the mayhem.  The court noted

24   that because of the gang allegations under California Penal Code § 186.22(b)(2), petitioner must

25   serve a minimum of fifteen calendar years of his life term before being eligible for parole.  Lodg.

26   /////

Doc. 36 at 1959-1960.  It also sentenced petitioner to a total determinate term of fifteen years, eight months to be served concurrently with the life term.  Id.

The amended abstracts list the date of the hearing as May 7, 1993, not any different date in 2007, and the file-stamp dates as well as the clerk's signature indicate that the forms are "nunc pro tunc" to 1993.  The abstracts record the sentence as announced by the trial court, while the original abstracts, filed in 1993, did not faithfully summarize the oral pronouncement of sentence.

In California:

> An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize. . . . [T]he certified abstract of the judgment constitutes the commitment.  It is thus the order sending the defendant to prison and the process and authority for carrying the judgment and sentence into effect.

People v. Mitchell, 26 Cal.4th 181, 185 (2001) (internal citation & quotation omitted).  Accordingly, unlike the petitioners in Burton or Ferreira, petitioner was not resentenced in 2007; rather, the summary of the sentence imposed in 1993 was merely corrected to reflect that sentence.  Under Burton, the sentence that forms the judgment was pronounced in 1993.

The statute of limitations is tolled during the pendency of any "properly filed" state collateral attack on the judgment.  Nino v. Galaza, 183 F.3d 1003, 1006-07 (9th Cir. 1999).  However, a state petition filed after the limitations period has run will neither revive nor toll the statute of limitations.  Jiminez v. Rice, 276 F.3d 478, 481 (9th Cir. 2001).  Petitioner did not begin to file collateral attacks until 1999, long after the statute of limitations expired.  These petitions did not revive the federal statute of limitations.

B.  Equitable Tolling

Petitioner also argues his federal petition is timely, in essence, because he obtained new evidence in 2008 and that any untimeliness may be excused because he is actually innocent.  Opp'n (Docket No. 16) at 3-4; Decl. of O'Shay Johnson (Docket No. 22) (O. Johnson Decl.).  He

also suggests he did not have access to his files or his transcripts for periods of time. Respondent counters that petitioner is neither diligent nor innocent.

### 1. Access To Transcripts And Files

Petitioner alleges that he received his trial transcripts from appellate counsel Lloyd Riley in 1996, but that "much of [his] documents was lost" when he was placed in segregation in 1997. He also alleges that in 2003 he received "clarification" that both trial counsel Peter Sailors and appellate counsel Lloyd Riley had died; around that time he sought Sailors' "work product, including documents of his investigation." O. Johnson Decl. ¶¶ 13, 14. In addition, in 2003, his family sent him police reports and investigative materials generated by his first appointed lawyer, Mr. Kerbs. Id. ¶ 15. This material included reports showing that one of the guns used in the attempted murder of Stanley Weaver was used hours later in an unrelated murder. Id.

The Ninth Circuit has held:

> We will permit equitable tolling of AEDPA's limitations period
> only if extraordinary circumstances beyond a prisoner's control
> make it impossible to file a petition on time. When external forces,
> rather than a petitioner's lack of diligence, account for the failure to
> file a timely claim, equitable tolling of the statute of limitations may
> be appropriate.

Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999) (internal quotations, citations omitted). It is petitioner's burden to show he is entitled to equitable tolling. Espinoza-Matthews v. People of the State of California, 432 F.3d 1021, 1026 (9th Cir. 2005). To meet his burden, he must demonstrate "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).

The Ninth Circuit has recognized that equitable tolling may be justified when, through no fault of his own, a habeas petitioner was separated from his legal files and transcripts. Thus, in Lott v. Mueller, 304 F.3d 918 (9th Cir. 2002), the court recognized that if petitioner was able to bear his burden of showing he was deprived of his legal material for a period of eighty-two days when he was away from the prison, he might be entitled to equitable tolling.

In United States v. Battles, 362 F.3d 1195 (9th Cir. 2004), the Ninth Circuit considered the relationship between access to transcripts and timely filing under the AEDPA. Battles alleged he had not timely filed his motion to vacate his sentence under 28 U.S.C. § 2255 because his appellate attorney did not send him his transcripts. The Ninth Circuit noted that when an attorney refuses to provide a petitioner's file, the petitioner may be entitled to equitable tolling; it found the reasoning equally applicable when the transcripts have been withheld. Id. at 1197-98; but see Jihad v. Hvass, 267 F.3d 803, 806 (8th Cir. 2001) (lack of access to transcripts is not basis for equitable tolling); Gassler v. Bruton, 255 F.3d 492, 495 (8th Cir. 2001) (possession of a transcript is not a condition precedent to filing a habeas petition); Lloyd v. Van Natta, 296 F.3d 630, 633 (7th Cir. 2002) (state's failure to provide complete transcript not a basis for equitable tolling because it did not prevent filing).

In this case, however, plaintiff has not borne his burden of establishing his entitlement to equitable tolling. He admits he received the transcripts in 1996, at the conclusion of the direct appeal, but does not suggest that he began to prepare his collateral attacks upon their receipt. O. Johnson Decl. ¶ 13. He does aver that "much" of his "documents" were lost when he was placed in segregation, but does not specifically identify the "documents" as his appellate transcripts or otherwise describe what portions of the transcripts were taken. He does not describe any efforts he took to replace what was taken, but such efforts must have borne fruit (if indeed the transcripts were lost) because petitioner attached portions of the clerk's and reporter's transcripts in support of his initial habeas petition, filed May 27, 1999. See Lodg. Doc. 5, Ex. A. Finally, he concedes that it was not until 2003 that he asked his family for the documents Attorney Riley had sent them; his perusal of these materials led him to believe that Attorney Sailors had not adequately investigated his case or prepared for trial. O. Johnson Decl. ¶ 15. Even if the court could construe petitioner's vague claims about the loss of his documents to constitute an "extraordinary circumstance," petitioner has not demonstrated that the transcripts were missing after 1999 or that he was pursuing his rights with any measure of diligence. He is not entitled to

equitable tolling. Similarly, even crediting petitioner's claim that he did not see Attorney Sailors' declaration that he was unprepared for trial until 2005, a dubious claim given petitioner's access to his transcripts in 1996, petitioner does not explain how this belated recognition of the document demonstrates his diligence. Objections at 10; O. Johnson Decl. ¶¶ 13, 18.

### 2. 28 U.S.C. § 2244 (d)(1)(D)

Petitioner also suggests that he is entitled to a different starting date for his AEDPA year for several reasons. First, he asserts he did not receive the police reports and investigative materials from Attorney Kerbs, first appointed to represent him, and thus did not realize that Sailors had not undertaken sufficient investigation, until 2003. O. Johnson Decl. ¶ 15.

Second, petitioner alleges he attempted to get declarations from witnesses, but that many of them "didn't want to be found." Id. ¶¶ 17, 22. For example, although he talked to Arnold Butler in 1997 and Butler agreed to give petitioner a declaration, Butler was then sent to federal prison and did not resume contact with petitioner, through Butler's wife, until 2005. Id. ¶ 18.[4] In addition, he was not able to obtain a declaration from Joe Williams until 2008, when he learned that a cousin had married Williams' step-son; Williams had not wanted to get involved earlier even though he knew petitioner was looking for him. Id. ¶ 19. Petitioner did not speak to his cousin Joe Marshall until after a death in the family in 2007; Marshall claimed he had not wanted to get involved before because he was in and out of prison. Id. ¶ 20. Similarly, petitioner's "lady friend" contacted co-defendant Lewis on petitioner's behalf at a time not specified, in an "attempt to see would he come forward after all these years" and so it was only in 2008 that he was able to obtain Lewis's declaration. Id. ¶ 21.[5]

/////

---

[4] The Butler declaration is not part of the petition, but rather is attached to the original opposition to the motion to dismiss. See Opp'n at 24.

[5] As with Butler's declaration, Lewis's is attached to the opposition to the motion to dismiss, not to the habeas petition. Opp'n at 25.

Third, it was only after he found Sailors' declaration in support of the motion to continue trial that petitioner believed he had enough evidence to support his writ. Id. ¶ 23.

Under section 2244(d)(1)(D), a habeas petitioner must file his petition within one year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." In Hasan v. Galaza, 254 F.3d 1150 (9th Cir. 2001), the Ninth Circuit noted that:

> [T]o have the factual predicate for a habeas petition based on ineffective assistance of counsel, a petitioner must have discovered (or with the exercise of due diligence could have discovered) facts suggesting both unreasonable performance *and* resulting prejudice.

Id. at 1154. In Hasan, the petitioner knew that juror Harris had had contact with Willie Mae Bernard, a prosecution witness in a separate case and that his trial counsel had not interviewed either Harris or Bernard at the time he filed a motion for new trial. Id. at 1152. In response to the motion for a new trial, the prosecution claimed that Bernard had no connection to Hasan's case. Id. at 1154.

Sometime after the conclusion of his direct appeal, Hasan learned from another inmate that Bernard had been involved in a romantic relationship with one of the chief prosecution witnesses against him. Only then did he pursue habeas relief. Id. at 1153. The Ninth Circuit observed that when Hasan learned about the relationship, he had "a good faith basis for arguing prejudice–that is, that had his counsel investigated and brought this information before the trial court, the trial court may have ordered a new trial." Id. at 1154. The court concluded, however, that the clock starts when the petitioner knows the facts themselves, not the legal significance of those facts. Id. at 1154 n.3.

Moreover, this provision of section 2244 does not provide "an extended delay . . . while a habeas petitioner gathers every possible scrap of evidence that might, by negative implication, support his claim." Flanagan v. Johnson, 154 F.3d 196 (5th Cir. 1998); Hereford v. McCaughtry, 101 F.Supp.2d 742, 745 (E.D. Wis. 2000) (petitioner not entitled to rely on this

section when he knew the factual predicate at the time of trial; fact that he might not have had all the evidence or understood legal basis not determinative).  Nevertheless, the diligence required under this section is not "the maximum feasible diligence" but rather "reasonable diligence in the circumstances," including physical confinement, which "can limit a litigant's ability to exercise due diligence."  Schlueter v. Varner, 384 F.3d 69, 74, 75 (3rd Cir. 2004) (internal quotations omitted).

### a.  Police Reports And Investigative Materials

Petitioner suggests he did not realize that Sailors had not interviewed those witnesses petitioner believed were vital to his defense until he received his files in 2003.  O. Johnson Decl. ¶ 15.  He does not explain, however, why he waited until 2003 to ask his family to send the materials; the record suggests that Attorney Riley sent them the materials in 1996.  Id. ¶ 13.  He has not suggested he acted with any diligence, much less due diligence in discovering this material.

However, even if the court deems 2003 to be the triggering date, petitioner has not timely filed: even his subsequent, potentially-tolling state petition was not filed until 2006.  Lodg. Doc. 11.

### b.  Sailors' Continuance Motion

In a request to continue trial, Attorney Sailors explained that he had not completed his investigation of petitioner's case because of his trial schedule.  Lodg. Doc. 11, Ex. B.  Petitioner claims he did not find this request until 2005 and so did not understand that Sailors had not undertaken any investigation.  O. Johnson Decl. ¶ 18.  Sailors' motion was included in the clerk's transcript, yet petitioner fails to explain why he did not find it earlier.  These circumstances do not provide a new triggering date under the AEDPA, as once again petitioner has failed to show he acted with due diligence in locating this document.

/////

/////

16

c. <u>Declarations From Butler, Lewis, Williams, Joseph And Freddie Marshall</u>

Petitioner argues he had difficulties obtaining declarations from these five people because of his incarceration and because these witnesses "didn't want to be found" or "didn't want to get involved." O. Johnson Decl. ¶¶ 19, 20. To some extent, petitioner "misapprehends the pertinent inquiry":

> The critical determination under § 2244(d)(1)(D) is whether the "factual predicate" for the claims (not their legal basis or all evidence supporting the claims) could have been discovered through the exercise of due diligence.

<u>Hereford v. McCaughtry</u>, 101 F.Supp.2d 742, 745 (E.D. Wis. 2000).

For example, petitioner claims that during trial he told Sailors that Butler would testify on petitioner's behalf, but that counsel told him it was not necessary. O. Johnson Decl. ¶ 10. Petitioner was thus aware of the factual predicate of this portion of the claim – that counsel had neither interviewed Butler nor called him to testify and that Butler was willing to testify favorably – at the time of trial. Moreover, even if the declaration constituted the factual predicate for, rather than the evidence supporting, the claim, it was signed in March 2005; petitioner's exhaustion petition on ineffective assistance of counsel was not filed until April 2006.

The same is true concerning Freddie Marshall's declaration: at the time of trial, petitioner knew he had an alibi for June 22 and 23 1992, told counsel about that alibi and knew counsel had presented no witnesses supporting it. O. Johnson Decl. ¶ 8. Thus petitioner was aware of the factual predicate for this claim even before the original statute of limitations began to run. Freddie Marshall's declaration provides only the evidentiary support for this claim; it does not trigger a new statute of limitations period.

Petitioner's declaration also shows that at the time of trial, he knew that Joe Williams and Joe Marshall might have information helpful to the defense and that counsel had not interviewed them nor called them as witnesses. <u>Id</u>. ¶ 9. Arguably, petitioner did not know what

Williams and Marshall would say until he secured his declarations, and he could not show prejudice from the claimed ineffective assistance of counsel without showing that these witnesses would have been willing to testify.  See Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000) (burden of showing ineffective assistance of counsel cannot be met without affidavits showing testimony of witnesses counsel failed to interview or call).

The date petitioner obtained the declarations does not trigger the renewed statute of limitations, however, unless he could not have known of the proposed testimony even through the exercise of diligence.  In light of the fact that petitioner knew of the potential usefulness of Joseph Marshall and Joseph Williams at the time of trial, his failure to secure their declarations earlier, even given the limitations of incarceration, does not demonstrate due diligence.  Petitioner avers that Joe Marshall did not want to get involved before 2008 because he was in and out of prison, but does not explain what attempts or how many attempts he made to secure Marshall's declaration before then.  Similarly, petitioner mentions in passing that he had been looking for Williams without describing what efforts he made to contact Williams before the fortuity of his cousin's marriage to Williams' step-son.

Finally, petitioner knew that Lewis's willingness to testify that petitioner was not with him on June 22 and 23, 1992 might be important, yet says only that he had not spoken to co-defendant Lewis since sentencing.  He does not claim he made any earlier attempts that were rebuffed or otherwise describe difficulties in making contact with Lewis.

Petitioner has not borne his burden of showing that the factual predicate for his claim of ineffective assistance of counsel could not have been known in the exercise of due diligence.

### 3. Actual Innocence

In Schlup v. Delo, 513 U.S. 298, 314-15 (1995), the Supreme Court held that a habeas petitioner who makes "a colorable showing of actual innocence" that would implicate a "fundamental miscarriage of justice" may be entitled to have "otherwise barred constitutional

18

claim[s]" considered on the merits. The Ninth Circuit has suggested that a sufficient <u>Schlup</u> showing might overcome the bar of the statute of limitations. <u>Majoy v. Roe</u>, 296 F.3d 770, 775-76 (9th Cir. 2002). Ultimately, it is petitioner's burden to demonstrate actual innocence. <u>Jaramillo v. Stewart</u>, 340 F.3d 877, 883 (9th Cir. 2003).

The Supreme Court has recognized that this exception to the statute of limitations is concerned with actual, as opposed to legal, innocence and must be based on reliable evidence not presented at trial. <u>Schlup</u>, 513 U.S. at 324; <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998).

Once petitioner has presented such evidence, a court must consider the new evidence in light of the evidence as a whole, and must determine whether in light of all the evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. <u>Doe v. Menefee</u>, 391 F.3d 147, 166 (2d Cir. 2004).

In this case petitioner has not met the first hurdle, for he has not presented reliable evidence of actual innocence. As the Supreme Court explained:

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

<u>Schlup</u>, 513 U.S. at 323. The court also cautioned that "timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." <u>Id.</u> at 332.

Apart from the affidavits petitioner has presented, he has suggested he is innocent for two reasons. The first is his claim that LaShawn Williams, the only person to identify him with certainty at trial, told him on the phone that she had perjured herself. O. Johnson Decl. ¶ 17. The court does not consider petitioner's self-interested account of this conversation, without any corroboration, to be reliable.

The second is the fact that one of the weapons used to shoot Mr. Weaver was used in a homicide after petitioner had been arrested. Opp'n ¶ 11; Pet. at 124. While this evidence is

more reliable, it is negative rather than positive evidence of petitioner's innocence and is not

supported by additional evidence to make the full showing required.

Finally, there are the declarations. Freddie Marshall's is based on hearsay: he

recounts what he remembers of his grandfather's interview with the police, rather than his own

recollection of petitioner's presence or call on June 23, 1992. Joseph Marshall's is similarly not

reliable, for it simply recounts what he told police: that he knew nothing about stolen cars and was

not in a stolen car with petitioner. Opp'n at 23; Pet. at 104. He does not affirmatively say that he

and petitioner were not involved with any of the stolen cars tied to the crime scene. Butler's

denial of gang membership undercuts his claim that petitioner was not a gang member; if Butler

was not a member, his claimed knowledge of petitioner's membership status lacks a reliable basis.

Williams' declaration is not reliable evidence of petitioner's innocence: he denies seeing

petitioner emerge from an alley in Del Paso Heights on June 23, 1992, but as he does not clearly

say he was in the area at the time, the fact that he did not see petitioner on that day is meaningless.

Finally, Lewis's declaration, coming from one with an interest in exonerating himself – and

carefully phrased so as to distance himself as well as petitioner from the crime scene – at the

remove of sixteen years from the shooting does not constitute reliable evidence of petitioner's

innocence. Petitioner has not borne his burden of passing through the Schlup gateway.

In his objections, petitioner argues that the court in its original findings and

recommendations "place[d] the buggy before the horse, by not considering the following four (4)

of petitioner's claims, thus effectively removing the root that would establish the Actual

Innocence gateway." Objections ¶ 39. He identifies the four claims as follows: that he was

denied the effective assistance of counsel, the jury was improperly instructed, the trial court

refused to protect his right to conflict free counsel, and he received an illegal sentence. Id. ¶¶ 40-

48. However, these are legal arguments going to the validity of the conviction; none of the issues

identified constitutes "newly presented" evidence of innocence. Griffin v. Johnson, 350 F.3d 956,

963 (9th Cir. 2003).

IV. Motion For Discovery

As part of his objections, petitioner included a motion for discovery and expansion of the record. Mot. for Discovery (attached to Objections) at 50-72. In light of the recommendation in this matter, the discovery request is moot.

IT IS THEREFORE ORDERED that:

1. The Findings and Recommendations filed September 10, 2009 are hereby vacated; and

2. Petitioner's motion for discovery and expansion of the record is denied.

IT IS THEREFORE RECOMMENDED that respondent's motion to dismiss is granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 16, 2010.

_____
U.S. MAGISTRATE JUDGE

2 john0496.mtd(2)

21